UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

SVETLANA SHKOLNIKOVA,

                                    Plaintiff,

                                                                    **MEMORANDUM & ORDER**

                v.                                                  18-CV-6400 (MKB)

LOUIS DEJOY, POSTMASTER GENERAL,[1]

                                    Defendant.

---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

    Plaintiff Svetlana Shkolnikova commenced the above-captioned action on November 9,

2018, against the Postmaster General of the United States Postal Service ("Defendant" or

"USPS").[2]  (Compl., Docket Entry No. 1.)  Plaintiff alleges claims for discrimination and

---

    [1]  While Plaintiff refers interchangeably to the United States Postal Service and the
Postmaster General of the United States Postal Service, the proper defendant for the purposes of
this Title VII lawsuit is the Postmaster General.  *See Mathirampuzha v. Potter*, 371 F. Supp. 2d
159, 163 (D. Conn. 2005) ("Under 42 U.S.C. § 2000e–16(c), the proper defendant in an
employment discrimination action brought by a federal employee is 'the head of the department,
agency, or unit.'  Thus, the proper defendant in a Title VII case brought by a [United States
Postal Service] employee is the Postmaster General."); *see also Dodson v. Runyon*, 86 F.3d 37,
39 (2d Cir. 1996) ("The district court dismissed the [Title VII] complaint because [the plaintiff]
had named the Postal Service as defendant rather than naming the Postmaster General."), *cert.
denied*, 520 U.S. 1156 (1997); *Soto v. U.S. Postal Serv.*, 905 F.2d 537, 539 (1st Cir. 1990) ("In
cases brought against the Postal Service, the Postmaster General is the only properly named
defendant.  A district court should dismiss claims brought against all other defendants, including
the U.S. Postal Service and the local postmaster." (internal citations omitted)), *cert. denied*, 498
U.S. 1027 (1991).  The Court therefore considers the Postmaster General as the only Defendant
for the purposes of this Memorandum and Order.

    [2]  Plaintiff also brought claims against Adela Livingston in her individual capacity,
(Compl.), but by Stipulation dated June 30, 2021, Plaintiff dismissed all claims against
Livingston.  (Stipulation dated June 30, 2021, Docket Entry No. 51-1.)  The Court approved the
Stipulation on July 6, 2021.  (Order dated July 6, 2021, Docket Entry No. 52.)

retaliation on the basis of her gender and pregnancy in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").[3]  (*Id.* ¶ 2.)  Defendant now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure as to these claims, and Plaintiff opposes the motion.[4]

For the reasons explained below, the Court denies Defendant's motion for summary judgment.

## I.  Background

The following facts are undisputed unless otherwise noted.[5]

### a.  Defendant's hiring of Plaintiff as a City Carrier Assistant 2 ("CCA")

On or about December 12, 2015, Plaintiff completed and submitted an online application for a CCA position with Defendant.  (Def.'s 56.1 ¶ 9; Excerpted Dep. of Svetlana Shkolnikova ("Pl.'s Dep.") 45:2–46:11, annexed to Def.'s Mot. as Ex. 1, Docket Entry No. 56-4; *see also* Excerpted Dep. of Svetlana Shkolnikova ("Pl.'s Dep."), annexed to Pl.'s Mot. as Ex. 1, Docket Entry No. 60-1.)  At the time, Plaintiff knew she was pregnant with her second child.  (Def.'s

---

[3]  In her Complaint, Plaintiff also alleged gender and pregnancy discrimination and retaliation claims in violation of the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* ("NYCHRL").  (Compl. ¶¶ 61–72.)  By stipulation dated August 5, 2020, the parties stipulated to the dismissal of Plaintiff's NYSHRL and NYCHRL claims with prejudice. (Stipulation dated Aug. 5, 2020, Docket Entry No. 33-1.)  The Court approved the stipulation and dismissed these claims on August 7, 2020.  (Order dated Aug. 7, 2020, Docket Entry No. 34.)

[4]  (Def.'s Mot. for Summ. J., Docket Entry No. 56; Def.'s Mem. in Supp. of Def.'s Mot. ("Def.'s Mem."), Docket Entry No. 56-1; Def.'s Reply in Supp. of Def.'s Mot. ("Def.'s Reply"), Docket Entry No. 56-8; Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n"), Docket Entry No. 58.)

[5]  (Def.'s Stmt. of Undisputed Facts Pursuant to Local Rule 56.1 ("Def.'s 56.1"), Docket Entry No. 56-2; Pl.'s Rule 56.1 Counter-Stmt. ("Pl.'s 56.1"), Docket Entry No. 59; Def.'s Resp. to Pl.'s 56.1 ("Def.'s 56.1 Resp."), Docket Entry No. 56-9.)

56.1 ¶ 9.)  Plaintiff then completed an online examination but does not recall the substance of the questions.  (*Id.* ¶ 10.)  During her in-person interview on January 7, 2016, the interviewer did not ask Plaintiff if she was pregnant and did not comment on her physical appearance.  (*Id.* ¶¶ 11–12.)  On February 6, 2016, Defendant hired Plaintiff as a CCA.  (*Id.* ¶ 12.)

CCAs "must be physically able to efficiently perform the duties of the position with or without reasonable accommodation."  (*Id.* ¶ 13 (quoting CCA Job Description at 3, annexed to Def.'s Mot. as Ex. 5, Docket Entry No. 56-4).)  The duties include "arduous exertion involving prolonged standing, walking, bending and reaching, and may involve handling heavy containers of mail weighing up to the allowable maximum mailing weight."  (*Id.*)  CCAs "deliver[] and collect[] mail on foot or by vehicle under varying road and weather conditions."  (CCA Job Description at 1.)  The probationary period for CCAs is ninety calendar workdays or one hundred and twenty days of employment, whichever comes first.  (Def.'s 56.1 ¶ 16.)  The purpose of a probationary period is to evaluate employees on the following factors: work quantity, work quality, dependability, work relations, work methods, and personal conduct.  (*Id.* ¶ 17.)  During this period, the employee has frequent contact with supervisors and managers, who observe these six factors in order to evaluate the employee's performance and provide feedback to develop specific plans to enhance performance and determine whether the employee should be retained or rehired at the conclusion of her or his temporary appointment.  (*Id.*)  Defendant may terminate a probationary employee at any time during the probationary period, and these employees are not permitted access to the grievance process.  (*Id.* ¶ 16.)

Defendant's Essential Functions Review Worksheet (the "Worksheet") lists the five main functional requirements to perform the duties in the standard position description.  (*Id.* ¶ 68.)  Adela Livingston, who served as an Area Manager for Customer Service and covered nine of the

Defendant's locations in Brooklyn, listed the following functional requirements of the CCA job and the percentage of time spent performing that duty in the job: (1) walking and climbing stairs (90%); (2) lifting/carrying up to seventy pounds (40%); (3) extended standing/walking (96%); (4) casing mail/fine manipulation (35%); and (5) bending/pulling/stooping/pushing/twisting (45%).  (*Id.* ¶¶ 26, 68 (citing Worksheet, annexed to Def.'s Mot. as Ex. 25, Docket Entry No. 56-5).)  On the Worksheet, the functional requirements of the CCA job include but are not limited to: lifting up to seventy pounds; carrying forty-five pounds and more; straight pulling; walking five to seven hours; standing eight to twelve hours; working outside and inside in excessive heat and cold, in excessive humidity, and on slippery or uneven walking surfaces; and working alone. (*Id.* ¶ 69.)

### b.  Plaintiff's employment as a CCA

Plaintiff was assigned to the Homecrest Carrier Annex ("Homecrest") in Brooklyn, New York, at a base salary of $16.06 per hour.  (*Id.* ¶¶ 18–19.)

On February 8, 2016, Plaintiff began the training program for new employees.  (*Id.* ¶ 20.) On February 11 and 12, 2016, Plaintiff attended the Carrier Academy, and was provided with an overview of the duties and responsibilities of a CCA, including learning how to scan and deliver mail.  (*Id.* ¶ 21.)  Plaintiff began her employment as a CCA at Homecrest on February 16, 2016, and was approximately twenty-five weeks pregnant at the time.  (*Id.* ¶¶ 23–24.)  On that day, Plaintiff first met with Steven Smerling, her supervisor, and also met with Livingston.[6]  (*Id.* ¶¶ 25–26.)  Plaintiff did not deliver any mail on that day.  (*Id.* ¶ 27.)

---

[6]  While the parties do not dispute that Plaintiff met with Livingston on February 16, 2016, they dispute the substance of the conversation.  Defendant claims that Livingston and Plaintiff "review[ed] the duties and responsibilities of a CCA."  (Def.'s 56.1 ¶ 26.)  Plaintiff claims that Livingston gave Plaintiff the address of the location where she was set to have a three-day training and also asked Plaintiff if she was pregnant.  (Pl.'s 56.1 ¶ 26.)

On February 17, 2016, Plaintiff reported to Bay Station in Brooklyn for three days of on-the-job training.  (*Id.* ¶¶ 28, 30.)  On the first day, she accompanied another CCA for an approximately eight-hour shift to deliver mail.  (*Id.*)  The next day, she accompanied another CCA for an approximately eight-hour shift to deliver mail.  (*Id.* ¶ 29.)  On February 19, 2016, Plaintiff completed her scheduled three-day training at Bay Station.  (*Id.* ¶ 30.)

### i.  Plaintiff's first doctor's letters and following steps

On February 18, 2016, Plaintiff visited her obstetrician-gynecologist, Dr. Saul Stromer. (*Id.* ¶ 31.)  Dr. Stromer wrote a letter stating:

> To Whom It May Concern: Please be informed that my patient, Mrs. Svetlana Shkolnikova is currently pregnant and her expected date of delivery is 5/31/2016.  I have advised her to be placed on restricted duty, very light work.

(*Id.* (quoting Letter from Dr. Stromer dated Feb. 18, 2016 (the "February 18 Letter"), annexed to Def.'s Mot. as Ex. 13, Docket Entry No. 56-5).)  Dr. Stromer advised restricted duty for Plaintiff because she "nearly died" during her first pregnancy.  (*Id.* ¶ 32 (quoting Pl.'s Dep. 85:24).) During Plaintiff's appointment, Dr. Stromer did not define "restricted duty, very light work." (*Id.* ¶ 33 (quoting Pl.'s Dep. 87:8–11).)  The letter did not include a description of what job duties Plaintiff was able to perform, given her pregnancy.  (*Id.* ¶ 36.)

On February 20, 2016, Plaintiff reported to Homecrest and was assigned a route without another CCA.  (*Id.* ¶ 34.)  Two days later, on February 22, 2016, Plaintiff returned to Homecrest and was assigned a route to complete on her own.  (*Id.* ¶ 35.)  That day, Plaintiff gave Dr. Stromer's February 18 Letter to Livingston, who told Plaintiff that the letter was vague because it included no description of what job duties Plaintiff was able to perform.  (*Id.* ¶ 36.)  On February 23, 2016, Livingston reached out to the human resources department regarding Plaintiff's request for restricted, light duty.  (*Id.* ¶ 37; Pl.'s 56.1 ¶ 37; Email dated Feb. 23, 2016,

annexed to Pl.'s Opp'n as Ex. 7, Docket Entry No. 60-7.)  Plaintiff alleges that on February 23, 2016, Smerling told her that there was no work for her and on February 29, 2016, Livingston told her there was "no work" for her.  (Def.'s 56.1 ¶ 92.)[7]

On February 24, 2016, Dr. Stromer provided Plaintiff with another letter stating that Plaintiff could "only lift up to [ten] pounds and only push and pull up to [thirty]" and "[could] only do limited stairs usage and limited bending," (the "February 24 Letter").  (Def.'s 56.1 ¶ 38 (quoting February 24 Letter, annexed to Def.'s Mot. as Ex. 15, Docket Entry No. 56-5).) Plaintiff testified at her deposition that Dr. Stromer drafted the February 24 Letter because her "boss" was looking for a specific amount of weight that she could lift, push, or pull.  (*Id.* ¶ 39 (quoting Pl.'s Dep. 99:14–23).)  The February 24 Letter did not discuss any limitations on Plaintiff's ability to walk for extended periods of time.  (*Id.* ¶ 41.)  In a second letter also dated February 24, 2016 (the "Second February 24 Letter"), Dr. Stromer opined that Plaintiff should not use the stairs and could only lift up to ten pounds.  (*Id.* ¶ 42.)  Plaintiff could not recall whether she gave the Second February 24 Letter to anyone, but believes that she "possibly" showed the letter to Livingston.  (Pl.'s Dep. 105:3–9.)

From February 24, 2016 to February 28, 2016, Defendant did not give Plaintiff any work, allegedly because Livingston was "not in receipt of medical documentation."  (USPS Equal Employment Opportunity Investigative Aff. of Adela Livingston dated Aug. 8, 2016 ("Livingston EEO Aff.") 4, annexed to Pl.'s Opp'n as Ex. 10, Docket Entry No. 60-10.)

---

[7]  Plaintiff provided this statement in her USPS Equal Employment Opportunity ("EEO") Investigative Affidavit dated July 20, 2016.  (Pl.'s USPS Equal Employment Opportunity Aff. ("Pl.'s EEO Aff.") 3, annexed to Def.'s Mot. as Ex. 35, Docket Entry No. 56-7.)  The EEO conducted an internal investigation.  (*See* Acceptance for Investigation dated June 17, 2016, annexed to Pl.'s Opp'n as Ex. 27, Docket Entry No. 60-27.)

### ii. February 29 Letter and subsequent letter

Livingston provided Plaintiff with a template letter dated February 29, 2016, listing the basic requirements of a CCA (the "February 29 Letter"). (Def.'s 56.1 ¶ 44.) The February 29 Letter listed the basic requirements of the duties that a CCA needs to perform for up to eight to twelve hours a day, six to seven days a week. (*Id.* ¶ 45.) The purpose of the letter was for Dr. Stromer to indicate what Plaintiff could do and to provide specific limitations based on Plaintiff's pregnancy in the following areas: (1) lifting up to seventy pounds; (2) sitting; (3) standing; (4) walking; (5) climbing; (6) kneeling; (7) bending; (8) stooping; (9) twisting; (10) pulling; (11) pushing; and (12) driving a two-ton postal truck (including climbing in/out to deliver parcels throughout a given time-frame per day). (*Id.*) Livingston had previously typed up the letter in Plaintiff's presence. (*Id.* ¶¶ 45–46.)

Dr. Stromer completed the February 29 Letter by adding handwritten notes. (*Id.* ¶ 46.) Dr. Stromer indicated that Plaintiff could lift up to ten pounds, sit, stand, walk up to two hours, climb one flight of stairs, kneel, bend, stoop, pull up to ten pounds, push up to ten pounds, and drive a two-ton postal truck. (February 29 Letter, annexed to Def.'s Mot. as Ex. 18, Docket Entry No. 56-5.) In addition, Dr. Stromer indicated that Plaintiff could not twist her body. (*Id.*) Following receipt of Dr. Stromer's response, Livingston told Plaintiff that "the note was not specific enough." (Excerpted Dep. of Adela Livingston ("Livingston Dep.") 70:19–24, annexed to Def.'s Mot. as Ex. 7, Docket Entry No. 56-4; *see also* Excerpted Dep. of Adela Livingston ("Livingston Dep."), annexed to Pl.'s Mot. as Ex. 4, Docket Entry No. 60-4.)

After Plaintiff provided the letters, Plaintiff was not assigned any routes. (Def.'s 56.1 ¶ 53.) Defendant contends that this was because there were no work assignments that Plaintiff could perform given Plaintiff's physical limitations, and Livingston expressed a concern for any

potential consequences to Plaintiff's health if she were placed on the schedule and suffered

injuries as a result of her physical limitations.  (*Id*.)  Plaintiff claims that her exclusion from the

work schedule was not due to any genuine concern over her condition or any desire to reasonably

accommodate her.  (Pl.'s 56.1 ¶ 53.)  Plaintiff contends that, instead, Defendant discriminated

against her by taking "away [her] hours" because of her "doctor's notes."  (Def.'s 56.1 ¶ 54

(quoting Pl.'s Dep. 116:8–15).)  Plaintiff testified that a CCA, identified as Vanessa W. ("Ms.

W."), worked in Staten Island and Defendant accommodated her during her pregnancy.[8]

(*Id.* ¶ 93.)

Livingston made the decision to take Plaintiff off the work schedule starting on February

29, 2016.  (Livingston EEO Aff. 4.)

### iii.  March 7 Letter and subsequent steps

Plaintiff provided Defendant with a letter dated March 7, 2016, prepared by Plaintiff's

primary doctor's physician assistant ("PA"), Semyon Elyash (the "March 7 Letter").  (Def.'s

56.1 ¶ 49.)  He examined Plaintiff for approximately twenty to thirty minutes prior to preparing

the letter on her behalf.  (Pl.'s 56.1 ¶ 49.)  Dr. Fayngersh, Plaintiff's primary care physician, then

signed the letter.  (*Id*.)  The March 7 Letter included the same categories as Dr. Stromer's

February 29 Letter, and noted that Plaintiff could sit, stand, kneel, bend, and stoop in a

continuous manner between eight and twelve hours per day.  (*Id.* ¶ 50.)  In addition, the March 7

Letter stated that Plaintiff could not walk for more than two continuous hours and could only

walk up one flight of stairs when the stairs were in a building.  (Pl.'s 56.1 ¶ 67.)  Plaintiff gave

---

[8]  Ms. W. resigned on or about September 14, 2015, for unspecified personal reasons.
(Def.'s 56.1 ¶ 102.)  She did not work under Livingston's direction.  (*Id.*)  There was no record
of a District Reasonable Accommodation Committee ("DRAC") referral being requested for Ms.
W., and Defendant's corporate representative had no knowledge as to whether a light duty
accommodation was provided.  (*Id.*)

the March 7 Letter to another employee because she could not reach Livingston, and Livingston obtained the letter from that employee.  (Def.'s 56.1 ¶ 51; Pl.'s 56.1 ¶ 51.)  Livingston notified Defendant's human resources department and the District Reasonable Accommodation Committee ("DRAC") of Plaintiff's request.[9]  (Def.'s 56.1 ¶ 52.)

### iv.  Plaintiff's formal reasonable accommodation request

On March 10, 2016, Plaintiff filed an Information for Pre-Complaint Counseling asking for a reasonable accommodation.  (*Id.* ¶ 55.)  She requested "[t]o be given work hours and only accommodate[d] on the limitations [her] doctor advised in concerns [sic] of [her] pregnancy" and "also to [be] transfer[red] to another station or district that [did not] have any issues handling [her]."  (*Id.* (quoting Information for Pre-Complaint Counseling, annexed to Def.'s Mot. as Ex. 20, Docket Entry No. 56-5).)  Plaintiff complained that she had not been given any work hours after presenting Dr. Stromer's letters to Livingston.  (*Id.*)

Plaintiff also contends that Timothy Lawson, a manager at Midwood Station in Brooklyn, on an unspecified date, notified Plaintiff that she was scheduled for "re-training" between March 17 and March 19, 2016.  (*Id.* ¶ 96.)  Defendant paid Plaintiff during the three days of training. (*Id.*)  Plaintiff later claimed that this was discriminatory, as there "was no reason for [her] to undergo training again."  (*Id.* (quoting Pl.'s USPS Equal Employment Opportunity Aff. ("Pl.'s EEO Aff.") 6, annexed to Def.'s Mot. as Ex. 35, Docket Entry No. 56-7).)

On March 22, 2016, Defendant referred Plaintiff's request for an accommodation of her pregnancy to the DRAC to conduct a DRAC meeting.  (*Id.* ¶ 56.)

---

[9]  Defendant contends that Livingston had construed Plaintiff's requests as a request for reasonable accommodation, communicated with Plaintiff regarding her limitations, and requested and obtained documentation from Plaintiff relating to her limitations.  (Def.'s 56.1 ¶ 52.)  Plaintiff disputes that Livingston requested documentation from Plaintiff regarding her limitations.  (Pl.'s 56.1 ¶ 52.)

### 1.  Defendant's reasonable accommodation process

Defendant's Handbook EL-507, Reasonable Accommodation, An Interactive Process (the "Handbook") provides procedures, guidance, and instructions on matters of reasonable accommodation that involve applicants and employees with disabilities.  (*Id.* ¶ 57.)  The stated goal of a reasonable accommodation is to enable qualified individuals with disabilities to perform the essential functions of the job and enjoy equal benefits and privileges of employment as employees without disabilities enjoy.  (*Id.* ¶ 58.)  When the reasonable accommodation process is activated, Defendant pursues a five-step process to determine whether to provide an accommodation to the employee.  (*Id.* ¶ 59.)  Defendant (1) determines whether an individual has a disability; (2) determines the essential functions of the job; (3) identifies the abilities and limitations of the individual; (4) identifies potential accommodations; and (5) determines the reasonableness of the accommodations and selects options.[10]  (*Id.*)

Each area and district is required to have a DRAC.  (*Id.* ¶ 60.)  The DRAC holds an interactive meeting with the employee, preferably in person, to discuss the accommodation request.  (*Id.*)  Before the meeting, the DRAC must obtain medical documentation from the employee.  (*Id.*)  The DRAC meets with the individual to review medical information; discuss and evaluate limitations to major life activities; discuss essential functions of the position in question and explore whether and how the individual can perform those functions without posing a direct threat to themselves or others; and elicit input regarding potential accommodations, including alternatives such as reassignment where necessary, available, and appropriate.  (*Id.* ¶ 61.)  A requested accommodation is not considered reasonable when it eliminates legitimate selection criteria; lowers standards of performance; creates jobs where none exist; or violates the

---

[10]  Plaintiff disputes that Defendant used this procedure for her request.  (Pl.'s 56.1 ¶ 59.)

seniority provisions of a collective bargaining agreement ("CBA"), reallocates or eliminates essential job functions, or otherwise substantially changes the fundamental nature of the job. (*Id.* ¶ 62.) The Handbook provides that consistent with the law, Defendant is not required to change or alter the essential functions of a job and is not required to reallocate the essential functions of the job to another individual. (*Id.* ¶ 63.) Once a determination is made that there is no reasonable accommodation that would enable the employee to perform the essential functions of her job and that no equivalent, vacant position exists, the employee remains off the work schedule and is not paid. (Def.'s Resp. ¶ 64.)

### 2. The DRAC meeting and denial of Plaintiff's request

The DRAC interactive process meeting regarding Plaintiff took place on March 28, 2016. Tenagh Bryant, the Chairperson for the DRAC, who also served as Defendant's Rule 30(b)(6) corporate witness in this matter, and the following employees attended the meeting: Livingston; Pamela Harris, A/HR Generalist Principal; Irene Fanelli, A/District Manager Safety; Matt Doxsey, Manager Health and Resource management; Joy Zerna, Occupational Health Nurse Administrator; Jeannette Brooks, Manager, Learning Diversity & Development; Defendant's attorney Donald Spector; and Ewin Sanchez, Disability Compliance Specialist. (Def.'s 56.1 ¶ 65; *see also* Excerpted Dep. of Tenagh Bryant ("Bryant Dep."), annexed to Pl.'s Opp'n as Ex. 6, Docket Entry No. 60-6.) The purpose of the meeting was to determine whether Plaintiff was a qualified individual with a disability who had a condition that would warrant a reasonable accommodation and to determine whether a modification could be made to her position that would allow her to perform the essential functions of the position. (Def.'s 56.1 ¶ 72.) Bryant testified in her deposition that not all pregnant employees request light duty or reasonable accommodations and that pregnancy is not considered a "disability" for the purposes of the

DRAC interactive process and does not mean that an employee will have a mental or physical impairment that will prevent that employee from being able to perform the core essential functions of their employment with Defendant.  (*Id.* ¶ 66.)

Plaintiff appeared at the DRAC meeting with counsel and presented the letters from Dr. Stromer and PA Elyash.  (*Id.* ¶ 67.)  At the DRAC meeting, Plaintiff requested that Defendant move the relay boxes or lighten the load that Plaintiff would have to deliver by splitting the mail in two parts.[11]  (*Id.* ¶ 70.)  The DRAC determined that it was not possible for Defendant to relocate relay boxes on a daily basis and that this would be an unreasonable and fundamental alteration of the nature or operation of Defendant's business and an undue hardship, and that the combination of mail and parcels that Plaintiff would deliver on her route each day would exceed Plaintiff's lifting requirements.  (*Id.*)

By letter dated April 14, 2016, Defendant denied Plaintiff's request for a reasonable accommodation.  (*Id.* ¶ 76.)  Based on Plaintiff's medical restrictions, the DRAC determined that Defendant could not provide any accommodation that would enable Plaintiff to perform the essential functions of a CCA.  (*Id.* ¶ 73.)  The DRAC determined that Plaintiff  "would not be able to perform the continuous walking duties on [Plaintiff's] assigned route to deliver the mail/parcels . . . which are essential functions of the carrier position."  (*Id.* ¶ 74 (Letter dated Apr. 14, 2016, annexed to Def.'s Mot. as Ex. 6, Docket Entry No. 56-4).)  The DRAC was also unable to identify an accommodation that would enable Plaintiff to push or pull a carrier cart that

---

[11]  Plaintiff contends that she also requested other potential accommodations that the DRAC failed to address, including a three-month "Light Duty" position, an assignment to a temporary light duty position such as an office job, assignment to truck-driving duty, a lighter mail bag, or short-term leave.  (Pl.'s 56.1 ¶ 70.)  Defendant contends that Plaintiff did not request that the DRAC consider offering her an unpaid or short-term leave of absence during this meeting.  (Def.'s 56.1 ¶ 71.)

would weigh ten pounds or under to perform street duties on her route. (*Id.*) The main

consideration by the DRAC was whether there was "anything [Defendant] [could] do to

accommodate [Plaintiff] to be able to perform the core essential functions of [her] job." (*Id.* ¶ 75

(quoting Bryant Dep. 141:10–23).) The DRAC advised Plaintiff that in the event that her

medical condition changed and she believed that she could perform the duties of her position, she

could submit a new request for accommodation. (*Id.* ¶ 78.) The DRAC further advised Plaintiff

that she could resign and reapply for the CCA position when she believed she could perform the

duties of the position, that she could appeal the denial within ten business days, and that she

could file an EEO ("Equal Employment Opportunity") complaint with Defendant within

forty-five days. (*Id.* ¶ 79.)

### v. Termination of Plaintiff's employment

By letter dated June 2, 2016, Defendant informed Plaintiff that it had terminated her

employment as a probationary CCA (the "Termination Letter"). (*Id.* ¶ 80.) The Termination

Letter explained that Plaintiff's probationary period evaluation had begun on the day of her

appointment, February 6, 2016, and had to be completed within ninety workdays or one hundred

and twenty days of employment with Defendant, whichever came first. (*Id.* ¶ 81.) The

Termination Letter also noted that beginning on March 19, 2016, Plaintiff had been on off-duty

status due to the physical limitations caused by her pregnancy, as described in the medical

correspondence Plaintiff presented in support of her request for light duty.[12] (*Id.* ¶ 82.) Finally,

the Termination Letter explained that because the DRAC could not accommodate Plaintiff's

---

[12] Plaintiff contests that she was put on off-duty status beginning on March 19, as she
was sent home every day she showed up to work between February 23, 2016, and February 29,
2016. (Pl.'s 56.1 ¶ 82.) Plaintiff also alleges that Livingston took her off the work schedule
entirely on February 29, 2016. (*Id.*)

request, Plaintiff did not work sufficient hours during her probationary period for Defendant to perform necessary performance evaluations during Plaintiff's probationary status. (*Id.*) Plaintiff had only been scheduled to work twice delivering mail on her own, on February 20, 2016, and February 22, 2016. (Pl.'s 56.1 ¶ 83.) Defendant explained that these circumstances warranted termination of Plaintiff's employment.[13] (*Id.* ¶ 82.)

Plaintiff contends that she completed on-the-job training between February 16 and February 19, 2016, and was able to demonstrate proficiency in job duties, her attitude on the job, and her ability to learn and correct based on management feedback. (Pl.'s 56.1 ¶ 108.) Plaintiff also contends that Defendant chose not to evaluate her despite her completion of two individual mail routes and performing her job duties at two different facilities for multiple supervisors. (*Id.*) After completing two mail routes by herself in February of 2016, Plaintiff made multiple attempts to work so that she could be evaluated further during her probationary period, but she was sent home each time. (*Id.*) Defendant contends that Plaintiff cites no evidence that points to its ability to evaluate a probationary employee based on less than a week of working for Defendant. (Def.'s 56.1 Resp. ¶ 108.)

### vi. Plaintiff's subsequent EEO Complaint

On June 17, 2016, Plaintiff filed a formal complaint with the USPS EEO (the "EEO Complaint"). (Def.'s 56.1 ¶ 84.) The EEO Complaint stated that according to the DRAC, Plaintiff had only requested a reasonable accommodation in the form of a short-term transfer to a job that did not require her to lift, push, and pull excessive weight until after she gave birth. (*Id.* ¶ 85.) Plaintiff claimed that Defendant terminated her employment solely because of gender-specific pregnancy disability, claimed that her retraining at Bay Station constituted retaliation for

---

[13] Plaintiff did not reapply to Defendant. (Def.'s 56.1 ¶ 83.)

her accommodation request, and faulted Defendant for failing to retrain her and give her hours after she gave birth. (*Id.*) Plaintiff also claimed that she had requested "a light duty assignment, such as an office job, truck driving duty, a lighter mail bag, or short-term leave, for three months until the end of her pregnancy." (Pl.'s 56.1 ¶ 85 (quoting EEO Final Agency Decision 7, annexed to Pl.'s Opp'n as Ex. 15, Docket Entry No. 60-15).)

On June 23, 2016, Defendant's EEO Dispute Resolution Specialist Darrell K. Ahmed completed an EEO Dispute Resolution Specialist's Inquiry Report. (Def.'s 56.1 ¶ 86.) On April 5, 2016,[14] Ahmed had conducted a telephone interview with Smerling, who had denied allegations of discrimination and had stated that Plaintiff provided medical documentation that she was unable to perform the essential portions of her job without compromising her health, which was the sole reason why Plaintiff was not provided with any work.[15] (*Id.* ¶ 87.) On April 6, 2016, Ahmed had also spoken with Livingston, who had denied Plaintiff's allegations of discrimination and explained that Plaintiff was unable to perform the essential functions of her position as a CCA based on her limitations as presented in medical documentation. (*Id.* ¶ 88.)

On June 30, 2016, the EEO Investigative Services Office accepted Plaintiff's EEO Complaint regarding: the issues of Plaintiff being told that there was no work available within

---

[14] The Court notes that the interviews of Smerling and Livingston on April 5 and 6, 2016, took place prior to Plaintiff's termination and prior to Plaintiff's receipt of the DRAC decision letter on April 14, 2016. (*See* EEO Dispute Resolution Specialist's Inquiry Report at 4, annexed to Def.'s Mot. as Ex. 32, Docket Entry No. 56-6 ("On April 5, 2016 a telephonic interview was conducted with Mr. Steven Smerling . . . .").)

[15] Plaintiff disputes Smerling's statement and notes that in one of his affidavits submitted during the EEO process, Smerling stated that his only interaction with Plaintiff's request was that he knew Plaintiff "informed management that she was pregnant and had restrictions," and that otherwise Livingston was responsible for all communications and interactions with Plaintiff. (Pl.'s 56.1 ¶ 87 (quoting EEO Investigative Aff. of Steven Smerling ("Smerling EEO Aff.") 2, annexed to Pl.'s Mot. as Ex. 11, Docket Entry No. 60-11).)

her restrictions and being sent home during the week of February 23, 2016, and on February 29, 2016; Plaintiff being notified to report for "re-training" from March 17 to March 19, 2016; Plaintiff being told that the DRAC had denied her request for light duty in April of 2016; and Plaintiff being told on or about June 2, 2016 that she was being terminated.  (*Id.* ¶ 89.)

### 1.  EEO Investigation Report

On August 31, 2016, EEO investigator Linda Ruggiero completed the EEO Investigation Report (the "Report").  (*Id.* ¶ 90.)  In connection with her investigation, Ruggiero collected affidavits from Plaintiff, Smerling, Livingston, and others.  (*Id.*)  In her affidavit, Plaintiff alleged Defendant discriminated against her based on her gender and retaliated against her by terminating her employment because she had filed a complaint of discrimination and participated in the informal complaint process.  (*Id.* ¶ 91.)  Plaintiff also noted that Livingston and Smerling had told her that there was no work available for her on February 23 and 29, 2016, and that neither made any effort to "engage in the interactive process with [her] in an attempt to find a reasonable accommodation."  (*Id.* ¶ 92.)  Plaintiff alleged that she had engaged in protected activity when she asked for a reasonable accommodation on February 22, 2016, and Livingston had retaliated against her by taking away her hours and refusing to attempt to accommodate her.  (*Id.* ¶ 94.)  Plaintiff claimed that she had requested short-term leave from the DRAC.  (*Id.* ¶ 95.)  She also claimed that Lawson had notified her that she had to undergo retraining between March 17 and March 19, 2016, which Plaintiff alleged was discriminatory because there was "no reason for [her] to undergo [paid] training again."  (*Id.* ¶ 96 (quoting Pl.'s EEO Aff. 7).)

Over the course of the investigation, Livingston, Smerling, Lawson, and Bryant also provided sworn affidavits.  Livingston stated that: after Plaintiff had given her the doctors'

letters, she had sent Plaintiff's medical documentation to the human resources department for review and to determine whether Defendant could accommodate Plaintiff's request for light duty,[16] (*id.* ¶ 97); there were no other carrier employees under her direction with medical restrictions similar to Plaintiff who were provided with light duty work, (*id.*); and Plaintiff was not scheduled for retraining in March and had reported for retraining without authorization, (*id.* ¶ 98).

In his affidavit, Smerling stated that he was not aware of Plaintiff being scheduled for retraining.  (*Id.*)  Lawson stated that he had not had managerial involvement in daily operations for Defendant's Brooklyn stations since 2011, had never met Plaintiff, and had not made any managerial decisions regarding her employment with Defendant.[17]  (*Id.*)  Livingston and Smerling both stated that Plaintiff's performance was not evaluated at thirty-day, sixty-day, or eighty-day intervals because Plaintiff did not work during her probationary period.[18]  (Def.'s 56.1 ¶ 99.)

In her affidavit, Bryant stated that she served as the DRAC chairperson, and that she first became aware of Plaintiff's "sex and pregnancy" on March 17, 2016, when Livingston referred

---

[16]  Plaintiff contends that in Livingston's February 23, 2016 email to Bryant, Matthew Doxsey, Anthony Impronto, and David Rudy, she inquired whether Plaintiff's probationary period could be extended or if Plaintiff could be left home until after her maternity leave.  (Pl.'s 56.1 ¶ 97.)  Defendant contends that Livingston raising this question is not evidence that extending Plaintiff's probationary period was indeed a viable option.  (Def.'s 56.1 Resp. ¶ 97.)

[17]  Plaintiff "dispute[s] the assertions made by . . . Mr. Lawson," as she has repeatedly alleged that Lawson called Plaintiff soon after Plaintiff made her March 10 complaint with the EEO and instructed her that Livingston requested that she report for retraining at Bay Station.  (Pl.'s 56.1 ¶ 98.)

[18]  Plaintiff contends that she did work during her probationary period, which began on February 6, 2016, Plaintiff's official date of hire.  (Pl.'s 56.1 ¶ 99.)

Plaintiff to the DRAC because of Plaintiff's request for a modification of her job duties as a CCA.[19]  (*Id.* ¶ 100.)

## 2.  Defendant's final agency decision

On September 8, 2016, Defendant sent a copy of the Report to Plaintiff.  (Def.'s 56.1 ¶ 101.)  Although Plaintiff initially requested a hearing, Plaintiff withdrew her request, and EEO Administrative Judge William Macauley remanded Plaintiff's EEO Complaint to Defendant for the issuance of a final agency decision.  (*Id.* ¶ 101.)  Defendant issued a final decision on August 14, 2018.  (*Id.* ¶ 104.)  In the final agency decision, Defendant concluded that the evidence did not support a finding that Plaintiff was subjected to discrimination and specifically that Plaintiff failed to establish a prima facie case of sex or pregnancy discrimination because she could not identify any similarly situated USPS employees who were treated more favorably.  (*Id.*)  Defendant stated that: Plaintiff failed to identify any similarly-situated employees who were treated more favorably; none of Plaintiff's supervisors were involved in Ms. W.'s request for light duty and Ms. W. worked at another location; and even if Plaintiff had established a prima facie case of discrimination or retaliation, Defendant had articulated a legitimate, nondiscriminatory reason for both denying Plaintiff's request for a reasonable accommodation and terminating her employment during her probationary period of employment.  (*Id.* ¶¶ 104–05.)  In addition, the final agency decision noted that based on Plaintiff's restrictions, Defendant was not able to provide any accommodation that would enable her to perform the essential functions of her CCA position, and there was no quasi-sedentary work available.  (*Id.* ¶ 107.)  The decision concluded that Plaintiff could not show that Defendant's stated reasons for not

---

[19]  Plaintiff disputes that Bryant learned about her "sex and pregnancy" on March 17, 2016 because she contends that Livingston had emailed Bryant regarding Plaintiff's first pregnancy-related accommodation request on February 23, 2016.  (Pl.'s 56.1 ¶ 100.)

accommodating her requests and for terminating her employment were pretextual, as there was no evidentiary support for Plaintiff's contention that management instructed her to attend retraining in March of 2016, and the record established that Plaintiff was pregnant at the time she was hired and was informed about the duties and responsibilities of the CCA position both at that time and during her on-the-job training.  (*Id.* ¶ 110.)  The decision further noted that all CCA employees undergo a probationary period, and it terminated Plaintiff's temporary appointment as a CCA because management was unable to perform the necessary performance evaluations during this period.  (*Id.* ¶ 108.)

## II.  Discussion

### a.  Standard of review

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021); *Windward Bora, LLC v. Wilmington Sav. Fund Soc'y*, 982 F.3d 139, 142 (2d Cir. 2020).  The court must "constru[e] the evidence in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (first quoting *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 118 (2d Cir. 2001); and then quoting *Johnson v. Goord*, 445 F.3d 532, 534 (2d Cir. 2006)).  The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)).  A genuine issue of fact exists when there is sufficient "evidence on which the jury

could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252.  The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment.  *Id.*  The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b.  Title VII pregnancy discrimination and retaliation claims

Defendant moves for summary judgment as to Plaintiff's discrimination and retaliation claims.  The Court addresses each in turn.

### i.  Pregnancy discrimination claims

Defendant contends that Plaintiff cannot establish a prima facie case of pregnancy discrimination because Plaintiff cannot present any direct evidence that her gender or pregnancy was the reason for her termination, and is unable to offer any evidence showing a discriminatory animus by Defendant.[20]  (Def.'s Mem. 3–13.)

Plaintiff contends that she can establish a prima facie case of pregnancy discrimination through proving direct evidence of discrimination or proving an inference of discrimination under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) burden-shifting test.  (Pl.'s Opp'n 4–17.)  Plaintiff argues that she suffered multiple adverse employment actions, and these actions occurred under circumstances giving rise to an inference of discrimination.  (*Id.* at 14–17.)

---

[20]  Defendant also notes that Title VII discrimination claims may proceed under a disparate impact theory of liability, but that the Complaint includes "no allegations" that can be read to assert this theory.  (*See* Def.'s Mem. 4 n.2; Def.'s Reply 5–6.)  Plaintiff does not argue any disparate impact claims, (*see generally* Compl.; Pl.'s Opp'n), and the Court therefore only considers the disparate treatment standard of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Title VII was amended by the Pregnancy Discrimination Act (the "PDA"), to clarify that

pregnancy discrimination is a form of gender discrimination prohibited by Title VII.  *Young v.*

*United Parcel Service, Inc.*, 575 U.S. 206, 210 (2015) ("The Pregnancy Discrimination Act

makes clear that Title VII's prohibition against sex discrimination applies to discrimination

based on pregnancy."); *Shultz v. Congregation Shearith Israel of City of New York*, 867 F.3d

298, 304 (2d Cir. 2017) ("Title VII's prohibition against sex discrimination applies to

discrimination based on pregnancy." (quoting *Young*, 575 U.S. at 210)); *Saks v. Franklin Covey*

*Co.*, 316 F.3d 337, 343 (2d Cir. 2003) (holding that Title VII applies to pregnancy discrimination

cases).  The amended statute states in pertinent part that:

> The terms 'because of sex' or 'on the basis of sex' include, but are
> not limited to, because of or on the basis of pregnancy, childbirth,
> or related medical conditions; and women affected by pregnancy,
> childbirth, or related medical conditions shall be treated the same
> for all employment-related purposes, including receipt of benefits
> under fringe benefit programs, as other persons not so affected but
> similar in their ability or inability to work . . . .

42 U.S.C. § 2000e(k); *see Saks*, 316 F.3d at 343 (stating that Title VII protects women who are

pregnant, have given birth, or have related medical conditions from discrimination); *Biehner v.*

*City of New York*, No. 19-CV-9646, 2021 WL 4924838, at *3 (S.D.N.Y. Oct. 20, 2021) ("Title

VII's prohibition against gender discrimination includes a prohibition against pregnancy

discrimination."); *Zuckerman v. GW Acquisition LLC*, No. 20-CV-8742, 2021 WL 4267815, at

*4 (S.D.N.Y. Sept. 20, 2021) (holding that Title VII applies to pregnancy discrimination).

Claims of pregnancy discrimination under Title VII are assessed using the

burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp.*, 411

U.S. at 792.  *See Lenzi*, 944 F.3d at 107 ("As with other Title VII claims, we apply 'the three-

step burden shifting analysis of *McDonnell Douglas Corp.*'" (applying *McDonnell Douglas*

burden-shifting test to pregnancy discrimination claim)); *Govori v. Goat Fifty, L.L.C.*, 519 F.

App'x 732, 734 (2d Cir. 2013) ("At the summary-judgment stage, properly exhausted Title VII

claims are ordinarily analyzed under the familiar burden-shifting framework of [*McDonnell*

*Douglas*] and its progeny."); *DeMarco v. CooperVision, Inc.*, 369 F. App'x 254, 255 (2d Cir.

2010) ("Pregnancy discrimination claims are analyzed using the three-step burden-shifting

analysis set forth in *McDonnell Douglas*."); *Infante v. Ambac Fin. Grp.*, 257 F. App'x 432, 434

(2d Cir. 2007) (applying *McDonnell Douglas* three-part test to Title VII case brought on the

basis of pregnancy discrimination); *Zuckerman*, 2021 WL 4267815, at *4 ("Discrimination

claims brought pursuant to Title VII are analyzed using 'the familiar burden-shifting framework'

articulated in *McDonnell Douglas Corp.*").  Under this framework, a plaintiff must first establish

a prima facie case of discrimination.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993);

*see also Ruiz v. County of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010).  "A plaintiff can establish

a prima facie case of pregnancy discrimination under Title VII by showing that: (1) she is a

member of a protected class; (2) she satisfactorily performed the duties required by the position;

(3) she was discharged; and (4) her position remained open and was ultimately filled by a non-

pregnant employee . . . [or] the discharge occurred in circumstances giving rise to an inference of

unlawful discrimination."  *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995); *see Bueno*

*v. Eurostars Hotel Co., S.L.*, No. 21-CV-535, 2022 WL 95026, at *8 (S.D.N.Y. Jan. 10, 2022)

(quoting *Quaratino*, 71 F.3d at 64) (applying prima facie test to claim for pregnancy

discrimination).  A plaintiff's burden at this stage is "minimal."  *Holcomb v. Iona College*, 521

F.3d 130, 139 (2d Cir. 2008) (quoting *Hicks*, 509 U.S. at 506); *see Kelleher v. Fred A. Cook,*

*Inc.*, 939 F.3d 465, 468 (2d Cir. 2019) ("A plaintiff's burden to establish an initial prima facie

case is, by design, 'minimal and de minimis.'" (quoting *Woodman v. WWOR–TV, Inc.*, 411 F.3d

69, 76 (2d Cir. 2005))).  If the plaintiff satisfies this initial burden, the burden then shifts to the

defendant to articulate a legitimate, nondiscriminatory reason for its actions.  *See Lenzi*, 944 F.3d

at 107 (applying burden-shifting test to pregnancy discrimination claim).  The defendant's

burden "is not a particularly steep hurdle." *Hyek v. Field Support Servs., Inc.*, 702 F. Supp. 2d

84, 93 (E.D.N.Y. 2010), *aff'd*, 461 F. App'x 59 (2d Cir. 2012).  It "is one of production, not

persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods.,*

*Inc.*, 530 U.S. 133, 142 (2000) (quoting *Hicks*, 509 U.S. at 509).  If the defendant offers a

legitimate, nondiscriminatory explanation for its action, the court must nevertheless deny

summary judgment if the plaintiff can show that the explanation was pretext.  *See Williams v.*

*Mount Sinai Med. Ctr.*, 859 F. Supp. 2d 625, 641–42, n.18 (S.D.N.Y. 2012).

### 1.   The prima facie case

The parties do not dispute that (1) Plaintiff is a member of a protected class; (2) she

applied and was qualified for the position; and (3) Defendant reduced her hours in February of

2016, removed her from the work schedule that same month, and later terminated her from the

position as a CCA in June of 2016.[21]  The parties dispute only whether Defendant's alleged

---

[21]  Plaintiff appears to assert that Defendant's failure to provide a reasonable
accommodation was an adverse action, but the Court finds that it was not.  Plaintiff contends that
Defendant did not give her a full and fair opportunity to participate in its accommodation process
due to her pregnancy, and that when her request was officially forwarded to the DRAC, the
"process was brief, conclusory, and failed to analyze viable accommodations that [Plaintiff] had
requested."  (Pl.'s Opp'n 14–15.)  The record demonstrates that the process before the DRAC
included a hearing which Plaintiff attended and was represented by counsel, and at least eight of
Defendant's employees attended, including a disability compliance specialist.  (Def.'s 56.1 ¶ 67;
DRAC Decision Letter at 1, annexed to Pl.'s Opp'n as Ex. 12, Docket Entry No. 60-12.)  At the
hearing, Plaintiff "presented medical documentation" and "confirmed that [she was] unable to
perform the essential duties of a [CCA]."  (DRAC Decision Letter 2.)  The DRAC meeting also
involved a discussion of the job duties of a CCA and potential reasonable accommodations.  (*Id.*)
Where courts have been willing to consider failure-to-accommodate claims as adverse
employment actions, the Second Circuit has been clear that a plaintiff must show that she sought

adverse employment actions, namely Plaintiff's reduction in hours, Plaintiff's removal from the

work schedule, and Plaintiff's termination, occurred under circumstances that give rise to an

inference of discrimination.  (Def.'s Mem. 6–13.)

Inference of discrimination "is a flexible [standard] that can be satisfied differently in

differing factual scenarios."  *Saji v. Nassau Univ. Med. Ctr.*, 724 F. App'x 11, 17 (2d Cir. 2018)

(quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)); *see also*

*Chertkova*, 92 F.3d at 91 ("[T]here is no unbending or rigid rule about what circumstances allow

an inference of discrimination.").  This prong may be "established if the employer fills the

position with 'a person outside the protected class who was similarly or less qualified than' the

plaintiff."  *Yu v. New York City Housing Dev. Corp.*, 494 F. App'x 122, 125 n.4 (2d Cir. 2012)

(quoting *Stockwell v. City of Harvey*, 597 F.3d 895, 901 (7th Cir. 2010)); *see also Szewczyk v.*

*Saakian*, 774 F. App'x 37, 38 (2d Cir. 2019) ("[The plaintiff's] allegation that two men were

advanced over her [in the interview process] was sufficient to give rise to an inference of sex

discrimination under Title VII and the NYSHRL."); *Benedith v. Malverne Union Free Sch. Dist.*,

38 F. Supp. 3d 286, 318 (E.D.N.Y. 2014) (finding that the plaintiff "advance[d] sufficient

evidentiary proof to defeat summary judgment as to the *prima facie* element of an inference of

race discrimination" where he showed that he was denied tenure around the same time tenure

---

an accommodation and that the employer did not accommodate her while accommodating others
that were similarly situated, which Plaintiff has failed to allege as noted below.  *See infra*, n.23;
*see also Reyes v. Westchester Cnty. Health Care Corp.*, No. 21-CV-410, 2021 WL 4944285, at
*3 (2d Cir. Oct. 25, 2021) (denying the plaintiff's prima facie failure-to-accommodate claim
where she "complain[ed] of her employer's failure to accommodate her pregnancy, [but] she did
not allege that her employer was more willing to accommodate other employees who were
similarly physically limited"); *Xiang v. Eagle Ents., LLC*, No. 19-CV-1752, 2022 WL 785055, at
*15–16 (S.D.N.Y. Mar. 15, 2022) (finding that plaintiff failed to establish a prima facie failure-
to-accommodate claim under Title VII on the basis of pregnancy discrimination where she failed
to allege similarly situated individuals who were granted accommodations).

was awarded to three other administrators outside the plaintiff's protected class).  "An inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)).  An inference of discrimination may also be raised by "showing that an employer treated [an employee] less favorably than a similarly situated employee outside his protected group." *Abdul-Hakeem v. Parkinson*, 523 F. App'x 19, 20 (2d Cir. 2013) (quoting *Ruiz*, 609 F.3d at 493).  "[T]emporal proximity between the employer's learning of an employee's pregnancy and an adverse employment action taken with respect to that employee . . . may . . . support . . . an inference of pregnancy discrimination." *Lenzi*, 944 F.3d at 108 (quoting *Asmo v. Keane, Inc.*, 471 F.3d 588, 594 (6th Cir. 2006)); *see Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 326 (S.D.N.Y. 2020) (collecting cases).

### A.   Reduction in work hours and removal from schedule

Defendant argues that because of Plaintiff's significant physical limitations which prevented her from performing a CCA's essential functions, and the unavailability of sedentary work, the "*only* way" Defendant could address Plaintiff's restrictions was by "not allowing Plaintiff to work and initiating the DRAC Interactive Process."  (Def.'s Mem. 8 (emphasis in original).)

Plaintiff contends that there was a one-day gap between her discussing her pregnancy-related accommodation request with Livingston and Smerling first telling her to go home without working, and a seven-day gap between this conversation and Livingston removing Plaintiff from

the Homecrest schedule entirely, "directly reflect[ing] [Livingston's] discriminatory animus against [Plaintiff], as someone who, at a minimum, did not want to deal with a pregnant employee." (Pl.'s Opp'n 8, 15.)

Plaintiff has met her burden of establishing an inference of discrimination based on Defendant sending her home without pay. There is no evidence that Plaintiff, a probationary CCA, was replaced by someone "outside [her] protected class," *Yu*, 494 F. App'x at 125 n.4. However, the temporal proximity between February 22, 2016 — when Plaintiff provided the February 18 Letter notifying Defendant: (1) that Plaintiff was pregnant, (2) that her expected date of delivery was May 31, 2016, and (3) that her doctor advised her to be placed on restricted duty and very light work — and Defendant sending her home without work on February 23, 2016, and continuously through February 29, 2016, (*see* Pl.'s Dep. 109:25–110:2 (stating that after she gave the letter to Smerling, her "hours were cut off completely, without even talking to [her]")), supports an inference that Defendant was motivated, at least in part, by Plaintiff's pregnancy when it removed Plaintiff from the schedule and sent her home without pay. *See Lenzi*, 944 F.3d at 108 ("[T]emporary proximity between the employer's learning of an employee's pregnancy and an adverse employment action taken with respect to that employee . . . may . . . support . . . an inference of pregnancy discrimination." (quoting *Asmo*, 471 F.3d at 594)); *Farmer*, 473 F. Supp. 3d at 326 (same); *Briggs v. Women in Need, Inc.*, 819 F. Supp. 2d 119, 128–29 (E.D.N.Y. 2011) (finding that plaintiff adequately alleged facts to raise an inference of discrimination where plaintiff's complaint showed a "close temporal proximity between her pregnancy and . . . the denial of her desired shift, denial of a transfer, and her termination"); *Pellegrino v. County of Orange*, 313 F. Supp. 2d 303, 315 (S.D.N.Y. 2004) ("Evidence of temporal proximity between an employee's request for maternity leave and her termination is

26

sufficient to establish an inference of discrimination." (citing *Flores v. Buy Buy Baby, Inc.*, 118 F. Supp. 2d 425, 430 (S.D.N.Y. 2000))).  As a result, Plaintiff has met her burden of establishing an inference of discrimination with regard to Defendant reducing her work hours and eliminating her from the schedule.

### B.   Termination

Defendant argues that it terminated Plaintiff's employment because "she was unable to perform a CCA's essential duties with or without a reasonable accommodation for her pregnancy, preventing [Defendant] from performing necessary performance evaluations and giving feedback during the probationary period to enhance performance and determine retention."  (Def.'s Mem. 7–8.)

Plaintiff argues that her termination occurred under circumstances that give rise to an inference of discrimination, because the decision was entirely due to "Defendant's prior discriminatory acts," namely removing her from the schedule, ordering her to attend unnecessary retraining, denying her request for reasonable accommodations of her pregnancy, and ultimately terminating her employment.  (Pl.'s Opp'n 1–2, 16.)  Plaintiff also contends that none of Defendant's employees will claim responsibility for her termination, suggesting that the reason for her termination is in fact discriminatory rather than legitimate.  (*Id.* at 1–2, 7, 16–17.)

As the requirement for finding an inference of discrimination is "flexible," *Saji*, 724 F. App'x at 17, and "minimal," *Littlejohn*, 795 F.3d at 313, the Court finds that Plaintiff has met her burden of establishing an inference of discrimination as to her termination.  Plaintiff presents evidence that Livingston "asked her directly if she was pregnant on her first day at Homecrest,"

and Plaintiff answered affirmatively,[22] (Pl.'s Opp'n 7; Pl.'s Dep. 75:19–20); Livingston questioned human resources employees as to whether Plaintiff's probationary period could be extended and she could be allowed to stay at home until after her maternity leave, which "fail[ed] to comply with [Defendant's] procedure for addressing an accommodation request from an employee," (Pl.'s Opp'n 9); and Defendant "failed to provide [Plaintiff] with precise instructions on what was needed for . . . Livingston to accept her reasonable accommodation request," (*id.*).[23]   In combination, the "sequence of events leading to [her] discharge," *Littlejohn*, 795 F.3d at 312 (quoting *Leibowitz*, 584 F.3d at 502), supports an inference of discrimination.

Thus, Plaintiff has carried her minimal burden and has established a prima facie discrimination case based on her reduction in work hours, removal from the schedule, and termination.

---

[22]   While Defendant disputes these facts, at most, the dispute raises an issue that has to be decided by a jury.

[23]   Plaintiff fails to demonstrate an inference of discrimination through comparison of her circumstances to that of Ms. W.  Plaintiff argues that "two pregnant, non-probationary employees . . . requested reasonable accommodations while they were at Homecrest around the same time," and neither was accommodated, (Pl.'s Opp'n 13), and claims that Ms. W., a CCA in Staten Island who was pregnant, was "accommodated for pregnancy" by being given a truck and delivering light packages.  (Def.'s 56.1 ¶ 93; Pl.'s Dep. 129:3–131:6.)  As Defendant argues, Plaintiff cannot "establish that she was accorded disparate treatment as compared to 'similarly situated' individuals" based on Ms. W because she "was in the same protected group as the Plaintiff with respect to sex/pregnancy," and is therefore not a proper comparator. (Def.'s Mem. 10–11); *see Abdul-Hakeem v. Parkinson*, 523 F. App'x 19, 20 (2d Cir. 2013) (noting that an inference is found when a plaintiff can "show[] that an employer treated [the] plaintiff less favorably than a similarly situated employee outside [her] protected group"); *see also Zheng-Smith v. Nassau Health Care Corp.*, No. 20-CV-3544, 2021 WL 4097316, at *2 (2d Cir. Sept. 9, 2021) ("To raise an inference of discrimination through comparison to another employee outside the protected class, the plaintiff must show that the comparator 'engaged in comparable conduct.'" (quoting *Ruiz v. County of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010))).  Plaintiff has thus failed to identify other, non-pregnant employees who were treated more favorably than Plaintiff when requesting light duty during their probationary periods as CCAs.

### 2.    Defendant's legitimate, nondiscriminatory reasons

Defendant argues that, given Plaintiff's "significant physical limitations preventing her from performing a CCA's essential functions, and the unavailability of sedentary work," the only way that Defendant could address Plaintiff's restrictions was by not allowing Plaintiff to work and initiating the DRAC process.  (Def.'s Mem. 8–9.)

Plaintiff argues that she worked a full day after she first requested accommodation on February 22, 2016, and attended additional training in March of 2016; that Defendant cannot explain why Plaintiff was only considered "off-duty" beginning on March 19, 2016, rather than the week of February 23, 2016, or on February 29, 2016; and that Livingston's refusal to engage in an adequate interactive process with Plaintiff unfairly prolonged Plaintiff's accommodation request.  (Pl.'s Opp'n 23–24.)

An employer's "'explanation of its reasons must be clear and specific' in order to 'afford the employee a full and fair opportunity to demonstrate pretext.'"  *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 105 (2d Cir. 2001) (quoting *Meiri v. Dacon*, 759 F.2d 989, 996–97 (2d Cir. 1985)), *superseded in part on other grounds by* Fed. R. Civ. P. 37(e).  "If the defendant proffers such a reason, the presumption of discrimination drops out of the analysis, and the defendant will be entitled to summary judgment unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination."  *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (alterations omitted).

Defendant has satisfied its burden of demonstrating that it had nondiscriminatory, legitimate reasons to reduce Plaintiff's work hours, remove her from the schedule, and terminate her.  Defendant contends that it could not provide any accommodation that would enable Plaintiff to provide the essential functions of her probationary CCA position without creating a

29

job that did not exist or violating the relevant collective bargaining agreement.  (Def.'s Reply 9–10.)  In addition, Livingston stated that Plaintiff was not given any work from February 24 through February 28 because Livingston "[w]as not in receipt of medical documentation from [Plaintiff]," and that she took Plaintiff off the work schedule on February 29, 2016.  (Livingston EEO Aff. 4.)  Plaintiff was also a probationary employee, and could not be evaluated within the period of time required for probationary employees because she could not work.  (Def.'s 56.1 ¶ 81; Termination Letter, annexed to Pl.'s Opp'n as Ex. 14, Docket Entry No. 60-14.)

### 3.  **Pretext**

Defendant argues that Plaintiff cannot refute Defendant's legitimate, non-discriminatory reason for denying her accommodation request and terminating her employment.  (Def.'s Mem. 17–18.)

Plaintiff argues that Defendant's stated reasons for the adverse employment actions she endured were mere pretext and are contradicted by the record.  (Pl.'s Opp'n 23–25.)

To survive summary judgment, "[t]he plaintiff must 'produce not simply "some" evidence, but "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the employment action.""'  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996)); *see Syken v. New York*, 824 F. App'x 84, 85 (2d Cir. 2020) ("[T]o defeat summary judgment the employee's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the employer's employment decision was more likely than not based in whole or in part on discrimination."); *Eyuboglu v. Gravity Media, LLC*, 804 F. App'x 55, 57 (2d Cir. 2020) (same); *see also Doe v. Bd. of Educ. of*

*Fallsburgh Cent. Sch. Dist.*, 63 F. App'x 46, 49–50 (2d Cir. 2003) ("Evidence that could permit a jury to believe that the defendant's proffered reasons are not believable can support an inference that they are pretexts for discrimination." (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000))); *Pediford-Aziz v. City of New York*, 170 F. Supp. 3d 480, 486 (E.D.N.Y. 2016) ("From . . . 'implausibilities, inconsistencies, [and] contradictions in' the proffered reasons . . . one 'could conclude that . . . explanations [are] pretext.'" (second alteration in original (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013) and applying *Zann Kwan* to Title VII discrimination claim)).

The Court finds that there are genuine material issues of fact regarding Plaintiff's reduction of work hours, elimination from the schedule, and termination, all of which preclude summary judgment. While Defendant claims that it could only address Plaintiff's restrictions by not allowing her to perform any work, a reasonable jury could find, based on the evidence, that there were potential alternative ways to address and accommodate Plaintiff's restrictions. Livingston's initial communications suggests that Defendant could have found alternative ways to accommodate Plaintiff. First, Livingston acknowledged in an email that Plaintiff had insisted that she was capable of working. Livingston wrote an email on February 23, 2016 to Impronto, Doxsey, Bryant, and Rudy, advising them that Plaintiff had given her a doctor's letter and that Plaintiff "was insistent that she could perform the duties and task[s] of the position." (Pl.'s Ex. 7.) Second, Livingston suggested that Plaintiff be allowed to stay home until after her maternity leave. Livingston acknowledged in her email that Plaintiff was "not proficient in the office and will be leaving prior to or right after her probationary period," and asked whether Plaintiff could be "left home" until after her maternity leave. (*Id.*) Thus, even assuming that the short-term leave of absence would not be permitted under the relevant CBA, (Def.'s Reply 9), Livingston's

email indicates that there were multiple options available.  Third, even if the managers of

Defendant's branches do not have the authority to grant or deny specific requests for reasonable

accommodations without the full decision-making process of the DRAC, the relevant CBA does

not indicate that it is necessary for an employee to be removed from the work schedule in

advance of the DRAC process.  (Livingston Dep. 23:16–24.)  Fourth, it is unclear whether

Defendant attempted to investigate any accommodation for Plaintiff prior to the DRAC referral.

Bryant, Chairperson of the DRAC, stated in her EEO Investigative Affidavit that she did not

have any knowledge of whether Homecrest "looked for work or tried to accommodate

[Plaintiff]'s restrictions[] prior to the DRAC referral."  (EEO Investigative Aff. of Tenagh

Bryant dated Aug. 1, 2016 ("Bryant EEO Aff."), annexed to Pl.'s Opp'n as Ex. 23, Docket Entry

No. 60-23.)

      A reasonable juror could also find that Defendant could have offered Plaintiff a truck as a

reasonable accommodation, particularly since Livingston had included driving in her February

29 Letter as one of the areas where Dr. Stromer's assessment of Plaintiff's capabilities was

required, (see Def.'s Ex. 18; Def.'s 56.1 ¶¶ 45–46); Plaintiff attended a course on truck driving

through the USPS on March 1, 2016, (Pl.'s Dep. 115:3–5); and Plaintiff testified that Ms. W. was

"given an accommodation by driving a truck and delivering light packages," (id. at 131:24–

132:4).  There is also a genuine issue of material fact regarding whether Lawson ordered Plaintiff

to attend mandatory retraining between March 17 and March 19, 2016, (Def.'s 56.1 ¶ 96), which

Lawson denies, (id. ¶ 98).

      Further, Plaintiff was terminated from her probationary period because of an inability to

work, (see Termination Letter), which was directly affected by her participation in the reasonable

accommodation process and ultimate denial of her reasonable accommodation.  While Defendant

32

argues that Plaintiff could not be evaluated because her physical limitations prevented her from performing a CCA's essential functions — "arduous exertion involving prolonged standing, walking, bending and reaching, and . . . handling heavy containers of mail weighing up to the allowable maximum mailing weight," (Def.'s 56.1 ¶ 13), Livingston's deposition testimony as to the factors considered in evaluating probationary employees — attendance, attitude, getting along with others, following instructions, and ability to understand and perform tasks — differ from these essential functions, (Livingston Dep. 39:8–23). The purported essential functions are also different from Defendant's stated "purpose" of a probationary period, which is to evaluate employees on the following factors: work quantity, work quality, dependability, work relations, work methods, and personal conduct. (Def.'s 56.1 ¶ 17.) Finally, Defendant does not explain why Plaintiff was only considered "off-duty" beginning on March 19, 2016, as stated in her Termination Letter, when Defendant removed her from the work schedule more than two weeks prior on February 29, 2016. (Termination Letter 1 ("However, you have been in an off-duty status, commencing March 19, 2016.").)

Based on the foregoing, a reasonable jury could conclude that the stated reasons for Plaintiff's reduction of work hours, elimination from the schedule, and termination were pretextual. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38 (2d Cir. 1994) ("[L]ooking at the statements, actions, and inactions of [the defendant] and its employees, questions and inconsistencies abound as to the reason for [the plaintiff's] discharge." (declining to grant summary judgment on Title VII discrimination claim)).

Accordingly, the Court denies Defendant's motion for summary judgment on Plaintiff's discrimination claim.[24]

### ii.   Retaliation claim

Defendant argues that Plaintiff's retaliation claim is duplicative of her claim for pregnancy discrimination and that Plaintiff cannot establish a prima facie case of retaliation. (Def.'s Mem. 13–17.)  While Defendant does not contest that it was aware that Plaintiff engaged in protected activities and suffered adverse employment actions, it denies that the denial of Plaintiff's accommodation request is an adverse action.[25]  Defendant also asserts that there is no causal connection between Plaintiff's alleged protected activities and the alleged retaliatory conduct of taking away her hours and denying her reasonable accommodation request.  (*Id.* at 15–17.)  Further, Defendant argues that even assuming Plaintiff could establish a prima facie case, Plaintiff could not refute the legitimate, nondiscriminatory reasons for the denial of her accommodation request and the termination of her employment.  (*Id.* at 17–18.)  In support,

---

[24]  Plaintiff also argues that she has submitted enough "direct evidence" that a prohibited discriminatory factor played a "motivating part" in her termination, arguing that she meets a "mixed-motive" standard for discrimination in addition to the *McDonnell Douglas* burden-shifting standard discussed above.  (*See* Pl.'s Opp'n 4–5, 14.)  In light of the Court's determination that Plaintiff's discrimination claim must be decided by a jury, the fact that Plaintiff uses largely the same evidence to argue that her pregnancy was a motivating factor in Defendant's action and that she can satisfy her burden to show that Defendant's legitimate, non-discriminatory reasons were pretextual under *McDonnell Douglas* (*compare* Pl.'s Opp'n 7–14 *with* Pl.'s Opp'n 14–17), and the comparatively lenient nature of the mixed-motive standard compared to *McDonnell Douglas*, the Court declines to consider this argument.  *See Parsons v. JPMorgan Chase Bank, N.A.*, No. 16-CV-408, 2018 WL 4861379, at *6 (E.D.N.Y. Sept. 30, 2018) (applying *McDonnell Douglas* burden-shifting test in summary judgment case but noting the "comparatively lenient 'mixed-motive' standard" in Title VII claims).

[25]  Plaintiff alleges that the three days of retraining in March of 2016 were in retaliation for her protected activities; Defendant disputes that Plaintiff was assigned to retraining.  (Def.'s Mem. 13.)  Because the question of whether Defendant required Plaintiff to retrain is a factual dispute, the Court construes the facts in the light most favorable to Plaintiff and assumes that Defendant required Plaintiff to retrain.

Defendant argues that: (1) it was not required to eliminate the essential functions of Plaintiff's CCA position to "create a job for Plaintiff that does not exist within the Postal Service," and terminated Plaintiff's employment during her probationary period because she was unable to perform a CCA's essential duties with or without a reasonable accommodation, due to the arduous position of being a CCA, (*id.* at 17); (2) it could not perform necessary performance evaluations and give feedback during the probationary period as a result, leading to Plaintiff's termination, (*id.* at 17–18); and (3) a CCA's probationary period lasts for ninety to one hundred and twenty days, and "[Defendant] could not evaluate Plaintiff's performance on the basis of her completing two routes and on-the-job training," (Def.'s Reply 10).

Plaintiff argues that because she requested accommodations, made a claim of discrimination, and participated in an EEO investigation regarding her allegation of discrimination, (Pl.'s Opp'n 17–25), Defendant "repeatedly" retaliated against her by sending her home on February 23, 2016, taking her off the work schedule, denying her request for an accommodation, ordering her to report to retraining, and terminating her, (*id.* at 17, 20–22). Plaintiff alleges two protected activities: (1) her initiation of Defendant's "interactive accommodation process with her first doctor's note requesting an accommodation" on February 22, 2016; and (2) her complaint to the EEO on March 10, 2016. (*Id.* at 19.)  In addition, Plaintiff contends that temporal proximity between her protected activity and adverse employment actions is sufficient to show causation. (*Id.* at 20–22.)  Plaintiff argues that Defendant's reasons for each of the adverse employment actions that she endured were "mere pretext" for Defendant's retaliatory purposes, and that a trier of fact could reasonably infer that Defendant is "attempting to cover up discriminatory intent." (*Id.* at 23–25.)

Title VII retaliation claims, like discrimination claims, are assessed using the *McDonnell Douglas* burden-shifting framework discussed above.  *Green v. Mount Sinai Health Sys., Inc.*, 826 F. App'x 124, 125 (2d Cir. 2020) (affirming and applying *McDonnell Douglas* standard); *Russell v. N.Y. Univ.*, 739 F. App'x 28, 32 (2d Cir. 2018); *Saji*, 725 F. App'x at 14 ("We evaluate retaliation claims under Title VII and the NYSHRL using the three-step 'burden-shifting evidentiary framework' outlined by the Supreme Court in [*McDonnell Douglas*.]"); *Littlejohn*, 795 F.3d at 315 ("Retaliation claims under Title VII . . . are . . . analyzed pursuant to . . . the *McDonnell Douglas* burden-shifting evidentiary framework." (citing *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010))); *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015) ("We analyze retaliation claims using the burden-shifting framework from [*McDonnell Douglas*].");  *Hicks*, 593 F.3d at 164.

To establish a prima facie case of retaliation, a plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  *Russell*, 739 F. App'x at 32 (quoting *Hicks*, 593 F.3d at 164).  The parties do not dispute that Plaintiff participated in protected activities through making a reasonable accommodation request through her doctor's letters and by filing a complaint with the EEO on March 10, 2016, (*see* Def.'s Mem. 15), that Defendant knew about the protected activity, or that there were adverse employment actions through Plaintiff's hours being reduced, her removal from the schedule, and her termination.  The only issue is whether Plaintiff has demonstrated a causal connection between her protected activities and adverse employment actions.

### 1.    Plaintiff's causal connection

A causal connection of retaliation can be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Littlejohn*, 795 F.3d at 319 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).  "Verbal comments may constitute direct evidence of discrimination when made by a decisionmaker in the adverse employment action, and where there is a close nexus between the comments and the action." *Silverio v. United Block Ass'n, Inc.*, No. 13-CV-5001, 2015 WL 221151, at *8 (S.D.N.Y. Jan. 14, 2015) (quoting *Messer v. Bd. of Educ. of N.Y.C.*, No. 01-CV-6129, 2007 WL 136027, at *14 (E.D.N.Y. Jan. 16, 2007)).  Indirect evidence may include a "showing that the protected activity was closely followed in time by the adverse action." *Colon v. Fashion Inst. of Tech.*, 983 F. Supp. 2d 277, 287 (S.D.N.Y. 2013) (quoting *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988)); *see also Feingold v. New York*, 366 F.3d 138, 156–57 (2d Cir. 2004) (stating that "the requirement that [the plaintiff] show a causal connection between his complaints and his termination is satisfied by the temporal proximity between the two" and collecting cases); *Nonnenmann v. City of New York*, No. 02-CV-10131, 2004 WL 1119648, at *22 (S.D.N.Y. May 20, 2004) ("Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999))).

A gap of seven months between a protected activity and an alleged retaliatory act can be "sufficient to infer causation." *Summa v. Hofstra Univ.*, 708 F.3d 115, 129 (2d Cir. 2013); eleven months "is, to say the least, at the very outer limit of the amount of time that is considered sufficient to establish causation," *Cronin v. St. Lawrence*, No. 08-CV-6346, 2009 WL 2391861, at *5 (S.D.N.Y. Aug. 5, 2009), but a gap of twenty months "suggests, by itself, no causality at all," *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001).

Plaintiff has sufficiently established causation based on temporal proximity. On February 22, 2016, Plaintiff submitted her doctor's letter requesting light duty and one day later, February 23, 2016, Smerling sent her home; Livingston removed her from the work schedule on February 29, 2016, (EEO Investigative Aff. of Steven Smerling ("Smerling EEO Aff.") 1, 3, annexed to Pl.'s Opp'n as Ex. 11, Docket Entry No. 60-11; Livingston EEO Aff. 4). Defendant reduced her work hours and then removed Plaintiff from the work schedule prior to engaging in the DRAC process. While Defendant can indeed remove an employee from the work schedule after the DRAC makes a determination that there is no reasonable accommodation that would enable the employee to perform the essential functions of her job and that no equivalent, vacant position exists, (Def.'s Resp. ¶ 64), there is no evidence that Defendant was required to remove Plaintiff from the work schedule prior to the DRAC process. (*See* Livingston EEO Aff. 4.) In addition, Plaintiff's retraining on March 17, 2016 through March 19, 2016, less than one month after Plaintiff submitted her doctor's letter requesting light duty and only one week after Plaintiff filed her March 10 Information for Pre-Complaint Counseling requesting a reasonable accommodation, (Def.'s 56.1 ¶ 96 (quoting Pl.'s EEO Aff. 7)), also supports causation based on temporal proximity. Further, less than three months later, and after Defendant had referred Plaintiff's accommodation request to the DRAC, Defendant terminated Plaintiff's employment.

(Termination Letter).  The Termination Letter explained that the DRAC had determined the

Defendant was "not able to provide any accommodation that would enable [Plaintiff] to perform

the essential functions of [her] job," and that there was no quasi-sedentary work available.

(Termination Letter 1.)  Because Plaintiff was "unable to work during [her] probationary period

since March 19, 2016," Defendant could not "perform . . . necessary performance evaluations,"

and thus Plaintiff was terminated.  (*Id.* at 2; Def.'s 56.1 ¶ 82.)  Temporal proximity applies to all

of these alleged adverse actions, as Livingston removed Plaintiff from the work schedule one

week after she submitted doctor's letters, Plaintiff attended retraining less than one month after

she submitted her doctor's letters and one week after she filed her March 10, 2016 EEO

complaint, and Defendant terminated Plaintiff less than three months after she submitted her

request.  *See Summa*, 708 F.3d at 127–28 (affirming that even a gap of seven months is within

the temporal range that the Second Circuit has found sufficient to raise an inference of causation

for retaliation purposes); *Rivera v. JP Morgan Chase*, 815 F. App'x 603, 608 (2d Cir. 2020)

("Close temporal proximity between the plaintiff's protected action and the employer's adverse

employment action may in itself be sufficient to establish the requisite causal connection

between a protected activity and retaliatory action.") (collecting cases); *Abrams v. Dep't of Pub.

Safety*, 764 F.3d 244, 254 (2d Cir. 2014) (finding gap of five months potentially supportive of

prima facie case of retaliation); *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cty.*,

252 F.3d 545, 555 (2d Cir. 2001) (finding gap of four months supportive of prima facie case of

retaliation); *De Figueroa v. New York*, 403 F. Supp. 3d 133, 157 (E.D.N.Y. 2019) ("There is no

firm outer limit to the temporal proximity required, but most courts in the Second Circuit have

held that a lapse of time beyond two or three months will break the causal inference."); *see also

Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (holding that the court may "exercise its

judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases").

These facts support a causal connection between Plaintiff's protected activities and the reduction of her work hours, her removal from the work schedule, and her termination, or at a minimum, the dispute raises an issue of genuine material fact that has to be decided by a jury.

### 2. Defendant's legitimate, non-retaliatory reason

Defendant has demonstrated that it had a legitimate reason for reducing Plaintiff's work hours and removing her from the schedule, based on its determination that she could not perform the essential duties of a CCA due to her medical limitations. (Def.'s Mem. 17.) For the same reasons stated above in discussing Plaintiff's discrimination claim, Defendant has met its burden in demonstrating a legitimate, non-retaliatory reason.

### 3. Pretext

To survive summary judgment on a claim of retaliation, a plaintiff must show that retaliatory intent was the "but-for" cause of any wrongful actions — that is, "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013); *see Hua Lin v. N.Y.S. Dep't of Labor*, 720 F. App'x 89, 90 (2d Cir. 2018) (same); *Russell*, 739 F. App'x at 32 (noting that to be actionable, the retaliation must have been the "'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor." (quoting *Zann Kwan*, 737 F.3d at 845)); *Zann Kwan*, 737 F.3d at 850 (Parker, J., concurring) (citing *Nassar*, 570 U.S. at 360) (noting that Title VII retaliation claims must show "but-for" causation). "Temporal proximity alone is insufficient to defeat summary judgment at [this] stage." *Zann Kwan*, 737 F.3d at 847; *see Abrams*, 764 F.3d at 254 ("[T]emporal proximity alone is not enough to

establish pretext in this Circuit." (citing *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010))). "However, a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at [the pretext] stage." *Zann Kwan*, 737 F.3d at 847 (finding close temporal proximity and inconsistent explanation for termination sufficient to raise a triable issue of fact as to pretext); *see Cowan v. City of Mount Vernon*, 95 F. Supp. 3d 624, 654–56 (S.D.N.Y. 2015) (finding temporal proximity of mere days along with the lack of evidence or indication that the employee was a poor performer sufficient to raise a triable issue of fact as to pretext).

The Court finds that there are genuine questions of material fact as to whether Defendant's proffered reasons for reducing Plaintiff's work hours, removing her from the schedule, and terminating her were pretextual and whether retaliatory intent was the "but-for" cause of any wrongful action. As discussed above, while Defendant claims that after Plaintiff requested a reasonable accommodation, the only way that Defendant could address Plaintiff's restrictions was by not allowing Plaintiff to work and initiating the DRAC process, (Def.'s Mem. 8–9), a reasonable jury could find, based on the record, and construing the evidence in the light most favorable to Plaintiff, that there were other options than completely eliminating Plaintiff's work hours between February 24 and February 28, 2016 and removing her from the work schedule entirely as of February 29, 2016, which led to her termination due to Defendant's purported inability to evaluate Plaintiff during her probationary period, (*see* Termination Letter), and that Plaintiff engaging in protected activities was the but-for reason for Defendant's adverse actions. While the law is clear that a "reasonable accommodation can never involve the elimination of an essential function of a job," *McMillan v. City of New York*, 711 F.3d 120, 127

(2d Cir. 2013), Defendant does not adequately explain why, immediately after Plaintiff presented doctor's letters in February of 2019, she was removed from the work schedule prior to the DRAC process, particularly in light of Plaintiff's insistence, according to Livingston, "that she could perform the duties and task[s] of the position."  (Pl.'s Ex. 7.)  Further, while Defendant has argued that it could not have evaluated Plaintiff because her physical limitations prevented her from performing a CCA's essential functions, (Def.'s Mem. 8), Livingston's deposition testimony regarding the ideal qualities for probationary employees and how Defendant evaluated these employees — by determining their attendance, attitude, ability to get along with others, ability to follow instructions, and ability to understand and perform tasks, (Livingston Dep. 39:8–23) — could be evaluated independently of the CCA essential functions of standing, walking, bending and reaching, and handling containers of mail, (Def.'s 56.1 ¶ 13).  *See Zann Kwan*, 737 F.3d at 846 (finding that the pretext stage "does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive" and that a plaintiff can fulfill this burden by "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action"); *Sohnen v. Charter Commc'ns, Inc.*, No. 18-CV-6744, 2022 WL 900602, at *11 (E.D.N.Y. Mar. 28, 2022) (finding that inconsistencies in the defendant's justifications for terminating the plaintiff were sufficient to raise a genuine issue of fact as to pretext); *Fasanello v. U.N. Int'l Sch.*, No. 19-CV-5281, 2022 WL 861555, at *13 (S.D.N.Y. Mar. 23, 2022) ("Plaintiff has put forth sufficient evidence to call into question [the defendant's] proffered explanation for his termination."); *see also Eldaghar v. City of N.Y. Dep't of Citywide Admin. Servs.*, No. 02-CV-9151, 2008 WL 2971467, at *12–13

(S.D.N.Y. July 31, 2008) (finding evidence of procedural irregularities to raise "genuine issues of material fact regarding . . . retaliatory motivation").

Accordingly, the Court denies Defendant's motion for summary judgment with respect to Plaintiff's Title VII retaliation claim.

### III.  Conclusion

For the foregoing reasons, the Court denies Defendant's motion for summary judgment in its entirety.

Dated: August 15, 2022
        Brooklyn, New York

SO ORDERED:

      _____s/ MKB_____
MARGO K. BRODIE
United States District Judge